CALVIN FARRELL HADLEY v. STATE OF INDIANA.

[No. 31,115. Filed July 23, 1968. Rehearing Denied December 10, 1968.]

*Charles A. Wilson,* of Columbus, for appellant.

*John J. Dillon,* Attorney General, and *Douglas B. McFadden,* Deputy Attorney General, for appellees.

MOTE, J.—Appellant, Calvin Farrell Hadley, his brother, Carl Steven Hadley, and another, James Woody Garland, were charged by affidavit with the crime of Second Degree Burglary. Omitting the formal parts, the affidavit is as follows:

"Alvin L. Wolfe being duly sworn, upon oath, says that he is informed and believes that on or about the 19th day of June, 1966, at and in the County of Bartholomew and State of Indiana, one James Woody Garland, one Calvin Farrell Hadley and one Carl Steven Hadley did then and there unlawfully, feloniously and burglariously break and enter into a building, not a dwelling house or place of human habitation, and in which they the said James Woody Garland, Calvin Farrell Hadley and Carl Steven Hadley had no right to enter, said building being occupied for business purposes by Richard L. Johnson, doing business as Johnson Oil Company, said building being located at 1314 Sixth Street, Columbus, Bartholomew County, Indiana, with intent to commit a felony therein, to-wit: To unlawfully and feloniously obtain unauthorized control over property of

the said Richard L. Johnson, and permanently deprive him of the use and benefit of any property then and there obtained, then and there being contrary to the form of the Statutes in such cases made and provided, and against the peace and dignity of the State of Indiana."

The cause was filed in the Bartholomew Circuit Court but was transferred to the Bartholomew Superior Court where, after preliminary proceedings, it was tried to a jury which returned its verdict of guilty, as follows:

"We, the Jury, find the defendant, Calvin Farrell Hadley, guilty of the offense of burglary in the second degree, as charged in the affidavit herein, and fix his age at ———— years (filling in the blank the age you find the defendant to be).

s/ William H. Harris
Foreman"

Appellant filed a Motion in Arrest of Judgment, which Motion was overruled, after which judgment was pronounced and entered as follows:

"IT IS THE JUDGMENT OF THE COURT that the defendant, Calvin Farrell Hadley, is guilty of second degree burglary as charged in the affidavit herein and that he is 25 years of age, that for the crime by him committed he be sentenced to the custody of the Board of Trustees of the Indiana Reformatory to be confined at the Indiana State Reformatory, as guilty of second degree burglary, for not less than two years nor more than five years and that he be disenfranchised for a period of five years and rendered incapable of holding any office of trust or profit during such period; and that he pay one third of the costs of this action taxed at $————."

Prior to trial, Appellant and his co-defendants filed their Motion to Suppress Evidence, the body of which is as follows:

"Comes now the defendants Calvin Farrell Hadley and Carl Steven Hadley, by their attorney, and respectfully move the Court to order the suppression from evidence in the forthcoming trial of said cause the following items, to-wit:

A. One (1) Royal Standard Typewriter, Serial No. 4875715, Model HHe, which said typewriter was search

(sic) for and seized from the residence of Calvin Hadley, 632 Maple Street, Columbus, Indiana, without legal process, and

B. Other items of personal property, the particulars of which are unknown, which were likewise search (sic) for and seized from said residence without legal process. As well as all photographs, written and oral testimony thereof, and all other reference thereto of any kind.

The above named defendants would further show the Court that said items, and particularly said typewriter, were on the 19th day of June, 1966, discovered and confiscated by the officers of the Police Department of Columbus, Indiana, in a manner violative of Article 1, Section 11 of the Constitution of the United States, and cases and statutes made and designed thereunder as follows:

1. That on or about June 19th, 1966, at approximately 6:30 A.M., police officers of the City of Columbus, Indiana, entered the said residence of Calvin Hadley at the above named address without consent, expressed or implied, and without a search warrant issued by any Court, nor without any justification whatever under the circumstances.

2. That said residence was then and there occupied by the above named defendants, being the sons of the owner thereof, and having a possessory right and interest therein.

3. That said officers entered said dwelling by illegally opening the closed rear door thereto, which said rear door opened into an enclosed back porch of said dwelling. That once therein, said officers searched for and seized, and photographed said typewriter without consent nor without legal process of any kind.

4. That after searching for, finding, and seizing said typewriter, said officers subsequently entered the rest of said residence and arrested the above named defendants for the charge of Second Degree Burglarly (sic).

5. That upon being arrested, the defendants were immediately taken to the Columbus Police Station and there detained while officers remained at said residence and continued their search and seizure, still without consent and still without legal process of any kind.

6. That said typewriter was not searched for nor seized incident to the legal arrest of these defendants,

since said search and seizure occurred prior to the time of their arrest and occurred in an area not contiguous to their presence nor within their immediate control.

7. That the search and seizure of said typewriter was further not incident to any *legal* arrest of these defendants since said arrest was without probable cause and not within the scope of any fresh pursuit of said officers.

8. That all searches and seizures of said residence subsequent to the arrest and devoid of all legal process whatsoever, and all evidence and items obtained therefore are likewise inadmissible.

WHEREFORE, the defendants and each of them pray that said evidence above described as well as all photographs and references thereto be suppressed from the trial of this cause and that the Prosecutor be further ordered, at peril of mistrial, to refrain from the introductions of said evidence directly or indirectly as well as making any direct or indirect reference to it."

The record is not clear whether evidence was heard on said Motion to Suppress or that only the evidence at the hearing on Appellant's Petition to Reduce Bond exclusively was considered by the trial court in overruling the Motion to Suppress Evidence as set forth above. In any event, Appellant filed a Motion for New Trial, which was overruled on December 21, 1966. This appeal results and Appellant assigns as error the overruling of said Motion for New Trial and relies for reversal upon two specifications as follows:

1. "3. Irregularities in the proceedings of the Court, wherein the Court abused its discretion and prevented the defendant (Appellant) from having a fair trial, to-wit:

(b) By overruling this defendant's (Appellant's) motion to suppress evidence illegally obtained by an unlawful search and seizure of his person and premises, and by allowing such evidence to be introduced at trial.

(c) By overruling this defendant's (Appellant's) motion in arrest of judgment filed subsequent to the jury's verdict of guilty.

7. Error of law occurring at the trial, in this, that the Court admitted, over the objection of the defendant (Appellant), State's Exhibit Number 9, namely, a typewriter

discovered at the defendant's residence by officers of the police department acting without the authority of a search warrant nor permission from any person, and the discovery of which typewriter at said residence was not incident to any lawful arrest of this defendant, which offer, objection by the defendant and the ruling of the Court thereon are as follows:

State: At this time, your Honor, the State will offer into evidence this Exhibit 9.

Defendant: To which counsel for the Hadley defendants will object on the basis that this typewriter was obtained by the police via an illegal search and seizure.

The Court: The objection is overruled. At this time the State's Exhibit Number 9 will be received into evidence."

2. Abuse of discretion in overruling Appellant's Motion in Arrest of Judgment, which is as follows:

"Come now the defendants, Calvin Farrell Hadley and Carl Steven Hadley, by their attorney, and move the Court to arrest judgment on the verdict heretofore rendered in this cause for the following reasons:

1. That the facts stated in the affidavit do not constitute a public offense.

WHEREFORE, the defendants and each of them pray that this motion be sustained, that judgment be arrested, and for all other relief in the premises."

Appellant says that "because grounds 3 (b) and 7 above both concern the suppression of evidence question, they will be grouped together and supported by one argument."

Inasmuch as the two specifications of alleged error (Nos. 1 and 2 above) are related and the answer to Appellant's assertions will be forthcoming and depend upon the validity of the "search" without warrant and the correctness of the admission into the evidence of Exhibit 9, we shall consider them together.

The fundamental issue to be determined in this appeal is whether the officers needed a warrant of search of the premises in which Appellant and his co-defendants were found. If not, the asserted errors cannot be well taken.

In our consideration of this appeal, we first are confronted with a number of assertions which do not have the support of the record submitted to us. In his Summary Statement of Evidence, Appellant says:

> "Because Appellant is principally urging as grounds for reversal the error of the trial Court in overruling his Motion to Suppress Evidence, the evidence upon which such ruling was predicated, i.e., that which was taken at the Petition to Reduce Bond hearing of the defendant Carl Steven Hadley and which is made a part of the record by Bill of Exceptions Number One (TR. P. 120) will be first summarized. What follows is what Appellant considers pertinent to this point."

Then follows a resume of the testimony of Captain of Detectives of the Columbus (Indiana) Police Department which concerns what occurred immediately before, during and immediately after arrest; a resume of the testimony of Police Officer Cleon Sweeney; Detective Sergeant Alvin Wolfe; and Police Officer Eddie Yeley. Appellant then says:

> "The evidence adduced at the trial of the cause, made a part of the record by Bill of Exceptions Number 2, containing the Evidence (TR. P. 198) will be summarized only to the extent that it is pertinent to the issue which Appellant is urging for reversal, i.e., the trial court's overruling of his Motion to Suppress Evidence. Appellant will therefore summarize only the offers, objections, and rulings of the Court on the items sought to be suppressed from evidence and which were the object of his Motion."

Following is Appellant's summary of the testimony of State's witnesses Patrolman Larry Hall and Richard Johnson, owner of the bulk oil plant which allegedly had been burglarized.

The evidence thus presented indicates that three men were seen about the oil plant from which a typewriter, later introduced in evidence over Appellant's objections, had been removed; the Police Department was informed; several police officers promptly arrived at the scene; some of the officers were informed that these three men were seen leaving the plant with a typewriter and had sought refuge in a nearby

residence, which is the home of the parents of two of the men involved who were emancipated. The parents and owners were not at home. Knocking at the front door of the residence and receiving no response, some of them went to the rear, entering a back porch to the weather door of the house. It developed that the typewriter could be and was observed by at least one officer. One officer "yelled out" and they may have heard "come in", but this is doubtful. They forced entrance to the residence, found the three men and arrested them, following which the charge herein was made against them. The typewriter was shown to be the property of the oil plant owner and without his knowledge or permission was removed therefrom and found in the possession of Appellant and two others under the circumstances here related.

In our opinion, this record does not support Appellant's contention that there was either an unlawful arrest or that there was an unlawful search.

It is not always necessary to have a warrant of arrest to make a lawful arrest. The record herein suggests to us that the officers of the law were conducting an investigation of a reported burglary, almost immediately following the perpetration of such felony, in fact, while efforts were being made by the Appellant to "get away" and to hide in the home where he was found and where he had been seen to enter. It is a fair conclusion, we think, that the officers were fairly hot on the trail and we find nothing unlawful about the arrest under the circumstances here presented and certainly the trial jury had the right to so find.

The facts concerning the asserted "illegal" search and confiscation of the typewriter, as well as its introduction into the evidence, must now be examined. We must preserve the constitional restriction that "[T]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable search, or seizure, shall not be violated; and no warrant shall issue, but upon probable cause,

supported by oath and affirmation, and particularly describing the place to be searched, and the persons or things to be seized." These restrictions are limited, however, to *unreasonable* searches and seizures. All arrests and all efforts to discover evidence moreover do not fall within such restrictions.

That a search incident to a lawful arrest is legal is well estalished. See Annotation 89 ALR 2d 717. The constitution prohibitions are applicable only to unreasonable search and seizure. *People* v. *Hord* (1928), 329 Ill. 117, 160 N. E. 135; *Harris* v. *United States* (1947), 331 U. S. 145, 91 L. Ed. 1399, 67 S. Ct. 1098. Further, it has been stated repeatedly that a search and seizure without a warrant is not unlawful if the arresting officers conducting the search at the time had a reasonable or probable cause for belief that a felony had been committed. *Snow* v. *State* (1955), 234 Ind. 234, 125 N. E. 2d 802; *Havener* v. *State* (1955), 234 Ind. 148, 125 N. E. 2d 25; *Arthur* v. *State* (1949), 227 Ind. 493, 86 N. E. 2d 698; *Thomas* v. *State* (1925), 196 Ind. 234, 146 N. E. 850; *Connell* v. *State* (1939), 215 Ind. 318, 19 N. E. 2d 267.

Many recent decisions in this area appears to have reached somewhat extreme results by abandoning these well established principles and incorporating academic subleties that have little foundation in reason or law.

The U. S. Supreme Court in *Agnello* v. *United States* (1925), 269 U. S. 20, 70 L.Ed. 145, 46 S. Ct. 4, 51 ALR 409, stated:

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits is not to be doubted."

Further, the search is not made illegal because it occurs before the lawful arrest. *People* v. *Vice* (1956), 147 Cal. App.

2d 269, 305 P. 2d 270; *Knight* v. *State* (1926), 171 Ark. 882, 286 S. W. 1013; *Gray* v. *State* (1960), 207 Tenn. 39, 336 S. W. 2d 22; *People* v. *Hughes* (1960), 183 Cal. App. 2d 107, 6 Cal. Rptr. 643.

In his brief, Appellant acknowledges the above principles of law. He further contends, and we agree, that the search must not only be made incident to the arrest, but contemporaneous therewith as to time and place. We do not agree, however, with Appellant's application of this principle. He argues that because the typewriter was found on a back porch, removed from the rest of the house and the room in which the arrest was made, the search must be illegal as not contemporaneous as to place of the arrest. Inherent in this argument is the fact that had the typewriter been found a few feet away in the main part of the house, the search would have been valid. It is this type of interpretation which must be avoided.

The instant case does not involve officers conducting an "exploratory" search for evidentiary materials. See: *Go-Bart Importing Co.* v. *U. S.* (1931), 282 U. S. 344, 75 L. Ed. 374, 51 S. Ct. 153; *United States* v. *Lefkowitz* (1932), 285 U. S. 452, 76 L. Ed. 877, 52 S. Ct. 420, 82 A.L.R. 775.

The Supreme Court of the United States has recognized the need in this area for a sound and reasonable application of general principles of law. In *Harris* v. *United States, supra,* that Court stated at page 152 of 331 U. S.:

"Nor can support be found for the suggestion that the search could not validly extend beyond the room in which petitioner was arrested. Petitioner was in exclusive possession of a four-room apartment. . . . But the area which reasonably may be subjected to search is not to be determined by the fortuitous circumstance that the arrest took place in the living room as contrasted to some other room of the apartment."

Having found the search incident to the arrest as to time and circumstance, and the only direction which remains is

whether or not the officers had a reasonable basis for ▮▮▮ believing that a felony had been committed. If such a basis is found, the arrest and therefore the search must be upheld.

The well known tests of "probable cause" and "reasonable grounds" are the determining factors to be applied to the specific factual circumstances. When applied to the instant case, there can be little doubt that the officers had probable cause to believe that a felony had been committed and that the perpetrators, seeking refuge, fled into the house entered by the officers.

The evidence shows that the report of the break-in was received by the police about 6:25 A.M. Further evidence shows that at least some of the officers arrived on the scene at 6:30 or 6:35 A.M. They went directly to the house which witnesses reported the Appellant had entered and the arrest was made about 6:45 A.M.

The officers not only had reasonable cause to believe that a felony had been committed, but that the person arrested was guilty of the commission of the felony. There further appears little doubt that the officers were in "fresh pursuit" of the Appellant. Evidence shows that as little as five minutes elapsed between the time of the report and the arrival of the officers upon the scene of the break-in, and about ten more minutes elapsed before the arrest had been perfected.

In *Stearsman* v. *State* (1957), 237 Ind. 149, 143 N. E. 2d 81, the officers had had the appellants under surveillance for a period of time before meeting at the home of one of the appellants. Upon arriving at the home, two officers went around to the back door, while two others remained in front and rang the front door bell. The wife of one of the appellants answered the front door and the officers entered and arrested the appellant. One officer testified that he entered the house for the purpose of arresting the three appellants

for second degree burglary and "that he had a sufficient number of men with him 'to guard the house to keep a flight from taking place.' " At page 166 of 237 Ind., this Court stated:

> "We believe this evidence . . . is sufficient to sustain a finding . . . that the officers entered the home of appellant Peak for the purpose of arresting appellants for the commission of a felony and not for the purpose of searching the house, and that at the time they entered the house they had probable cause to believe that appellants had committed a felony. . . . Under these circumstances the articles which appellants sought to suppress were legally seized and there was no violation of appellant's rights against unlawful search and seizure."

Although there was some evidence that the officers in the case at bar responded to the words "come in" before entering the house, even assuming that no response or consent to enter was given, there is no doubt that the entrance and ensuing arrest would be any less legal, either in the *Stearsman* case or in the instant case.

In *Henderson* v. *State* (1955), 235 Ind. 132, 131 N. E. 2d 326, police officers investigated a report of shots heard in appellant's apartment. The officers knocked on the door and *after nobody responded, they entered.* Appellant contended that this was a violation of constitutional prohibitions against unreasonable search and seizure. This Court stated the general principle that an officer, having reason to believe the person to be arrested committed the felony which he had reasonable grounds to believe was committed, can arrest without a warrant and search the party arrested *and the premises.* See also: *North* v. *People* (1891), 139 Ill. 81, 28 N. E. 966; *People* v. *Humphreys* (1933), 353 Ill. 340, 187 N. E. 446; *People* v. *McGowan* (1953), 415 Ill. 375, 114 N.E. 2d 407; *People* v. *Clark* (1955), 7 Ill. 2d 163, 130, N. E. 2d 195; *Robinson* v. *State* (1925), 197 Ind. 144, 149 N. E. 891; *Eiler* v. *State* (1925), 196 Ind. 562, 149 N. E. 62.

Further, this case is not factually aligned with those decisions mandating search warrants in instances in █ which they can, and should be, obtained easily. *Mapp* v. *Ohio* (1961), 367 U. S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684.

In *Cooper* v. *California* (1967), 386 U. S. 58, 65, 17 L. Ed. 2d 730, 736, 87 S. Ct. 788, Justice Douglas succinctly stated the distinction we make:

"Unless the search is incident to an arrest, I would insist that the police obtain a warrant. . . ."

We may say that we are not unaware of the charge made against the Appellee of failure to "grapple" with the central question involved in this appeal. This, we think, hinges upon an appraisal of the demonstrated facts and inferences therefrom as contained in the briefs. It seems to us that the record before the Court and with which this Court must concern itself is wholly lacking in tenor, thus to create the necessity for a text-book opinion on the ideas and ideals of a democratic society. It is not helpful, in our opinion, to dwell upon such cliches as "it is the illegality of the entry in this case that makes the search invalid, not the fact that the search occurred before the arrest." Perhaps we can put the fundamental principle in proper perspective: The search herein was made in conjunction with a lawful arrest.

Further, the result and applicable principles of law involved herein can in no way be said to infringe upon or weaken the constitutional right of every individual to █ be free from *unreasonable* search and seizure and *illegal* arrest. It must be stressed, however, that the mere fear of infringement upon these rights, if the law be improperly administered, creates no rights and this alone should not be the basis or rationale of any dilution of the established law.

The judgment is affirmed.

Arterburn, J., Concurs.

Lewis, C. J., concurs with opinion, in which Arterburn, J., concurs also.

Hunter, J., dissents with opinion in which Jackson, J., concurs.

## CONCURRING OPINION

LEWIS, C. J.—The Court today passes on several questions which have been, and still are, of major concern in the area of criminal procedure relating to search and seizure under the Fourth Amendment of the Constitution of the United States. At the outset, it should be stated that the wide variance of opinion, as expressed in the majority, concurring and dissenting opinions, may in large measure stem from this Court's efforts to stay abreast with the rapidly changing, and to say the least, chaotic uncertainty of the Constitutional dimensions for this field of law. Mr. Justice Harlan forecast such diversity of opinion in his concurrence in *Ker* v. *California* (1963), 374 U. S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726, where he characterized the lack of predictability of the recent Supreme Court decisions. It is interesting to note that his commentary was derived from that Court's resolution of a very similar fact pattern as those presented on this appeal.

Both the majority opinion and dissent today state the essential issue in this case in a different manner. However, both opinions largely are concerned with the legality of the entry made onto the premises occupied by the appellant. The question is really whether the conduct of the police in perfecting an arrest of the appellant requires this Court to exclude from the evidence as presented in the trial over objections, a typewriter seized from that premises, thereby calling for a reversal of the judgment of guilty entered by the trial court.

In order to make a determination on this matter, there are three questions that must be answered:

*First.* Did the officers have probable cause to arrest the appellant?

*Second.* Did the officers have probable cause to enter the premises, and was that entry "reasonable?"

*Third.* Was the method of entry to that premises within the requirements of both Indiana statutory requirements and the requirement of "reasonableness" under the Fourth Amendment?

If these questions can all be answered in the affirmative, the decision of the trial court in overruling the appellant's motion to suppress the typewriter from evidence must stand.

The Fourth Amendment of the United States Constitution requires that both searches and seizures (arrests) be made "reasonably" and with probable cause. It states:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

This right of privacy was not adopted solely for the protection of the criminal. Our Nation's history prior to the adoption of the Bill of Rights does not reflect such a philosphy. There is little doubt that the Amendment stems from the desire of our founders that "Every man's home be his Castle." This protection extends to all citizens, whatever their position in life. To relax it in the administration of law enforcement would leave a mere "form of words." [See *Mapp* v. *Ohio* (1960), 367 U. S. 643] Mr. Justice Frankfurter reflected:

"By the Bill of Rights the founders of this country subordinated police action to legal restraints, not in order to convenience the guilty but to protect the innocent. Nor did they provide that only the innocent may appeal to these safeguards. They knew too well that the successful prosecution of the guilty does not require jeopardy to the innocent. The knock at the door under the guise of a warrant of arrest for a venial or spurious offense was not unknown to

them. . . ." *United States* v. *Rabinowitz* (1949), 339 U. S. 56, 82 (dissenting), 70 S. Ct. 430, 94 L. Ed. 653.

As a consequence, so that our society may exercise its cherished right of privacy in its legal pursuits, our law enforcement system must pursue its goals under what many may call a burden. Whether the requirements of the Fourth Amendment constitute a burden, or a hazard to the disrespectful, I am convinced that the activity of the police in the instant case fell within the Constitution's permissable limits.

Historically, the devolopment of standards by which an arrest or search might legally be undertaken is complex. The primary guidance for all courts is, of course, the language of the Fourth Amendment itself. This language has, however, yielded to several stages of legal development and analysis by our highest Court. Before any resolution of the issues presented on this appeal can be made, there must be a clear understanding of the interpretations placed on the requirements of "reasonableness" and "probable cause" by the Supreme Court of the United States, which we are bound to follow. In 1947, five (5) members of that Court, speaking through Mr. Justice Murphy, formulated:

> "It is a cardinal rule that in seizing goods and articles law enforcement agents must secure and use warrants wherever *reasonably practicable.* . . ." (emphasis added) *Trupiano* v. *United States* (1947), 334 U. S. 699, 68 S. Ct. 1229, 92 L. Ed. 1663.

The same test of "practicality" was applied by that Court to the law of arrest. By 1949, however, this standard was rejected by the Court in *United States* v. *Rabinowitz, supra.* The Court reinstated the Constitutional test of reasonableness, overruling any case law which suggested the theory that a warrant was an equivalent to reasonableness.

> "It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it

is practicable to procure one. The mandate of the Fourth Amendment is that the people shall be secure against unreasonable searches. . . ." *Rabinowitz, supra.*

In a dissenting opinion, stating what is now influencing the Court, Mr. Justice Frankfurter argued that only "necessity" would waive the requirement for a warrant. He said:

". . . The exception may in part be a surviving incident of the historic role of the 'hue and cry' in early Anglo-Saxon law. . . . Its basic roots, however, lie in necessity. What is necessity? Why is search (without a warrant) permitted? For two reasons: first, in order to protect the arresting officer and to deprive the prisoner of a potential means of escape, *Closson* v. *Morrison,* 47 N. H. 482, and second, to avoid destruction of the evidence by the arrested person. . . ." *Rabinowitz, supra.*

There is little doubt that the pendulum of the Court has swung back from the majority position of the *Rabinowitz* Court to a position that sounds in, if not requires, "necessity." A primary example of this reverse shift is illustrated in the Court's resolution of an appeal on the Constitutionality of required blood tests where no warrant was acquired. The Court stated:

"Although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of the petitioner's blood for alcohol, the question remains whether the officer was permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test. Search warrants are *ordinarily required* for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned. . . ." *Schmerber* v. *California* (1966), 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908. (emphasis added)

*Schmerber, supra,* however, was rendered on the basis of the *bodily* intrusion, which, as the case indicates, may have limited this language to such a situation.

Recent stop-and-frisk decisions, *Terry* v. *Ohio* (1968), 392 U. S. 1, 88 S. Ct. 1868, and *Sibron* v. *New York* (1968), 392 U. S. 40; *Peters* v. *New York* (1968), 88 S. Ct. 1889, indicate that the philosophy of *Jones* v. *United States* (1950), 357 U. S. 493, 78 S. Ct. 1253, 2 L. Ed. 2d 1514, otherwise remains largely unfettered. *Jones, supra,* propounded:

". . . The exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn, and search incident to a valid arrest is among them. . . ."

It is clear that the stop-and-frisk decisions are founded on the "necessity" of the protection of an officer. Limited searches of the person are permitted if the officer shows a reasonable belief that a "suspect" he has confronted is or may be armed with a dangerous weapon. It is noteworthy that this intrusion of the privacy of the person is sanctioned on something less than probable cause for arrest. The indication seems to be that the realities of police enforcement call for the courts to relax the stringency of the "exigency" or "emergency" doctrine.

In the instant case the sighting of the typewriter was made as the police officers entered the back screened porch of the appellant's father's home. The recent decision of *Sabbath* v. *United States* (1968), 320 U. S. 219, 88 S. Ct. 1755, confirms that the opening of the screen door was a "breaking" (as correctly developed in today's dissent). Consequently, there was an entry, and for the admission of that typewriter to stand, we must determine whether the arrest made by the police was on "probable cause" and whether the entry under the circumstances was "reasonable." See *Henry* v. *United States* (1959), 361 U. S. 98.

Before resolving this issue, it is incumbent that this Court be clear as to what today constitutes "probable cause." Its development, no less than that of "reasonableness," is control-

ling in resolving the issues we face. Probable cause has never been susceptible to a specific definition.

> ". . . It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion . . . though an arresting officer need not have in hand evidence which would suffice to convict. . . ." *Wong Sun* v. *U. S.* (1963), 371 U. S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441.
>
> "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar* v. *U. S.* (1949), 338 U. S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879.
>
> "Probable cause exists where: 'the facts and circumstances within [the arresting officers'] knowledge of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. . . ." *Draper* v. *U. S.* (1959), 358 U. S. 307, 313, 79 S. Ct. 329, 3 L. Ed. 2d 327. See also: *Husty* v. *U. S.* (1931), 282 U. S. 694, 700-701, 51 S. Ct. 240, 74 A.L.R. 1407, 75 L. Ed. 629, *Dumbra* v. *U. S.* (1925), 268 U. S. 435, 441, 45 S. Ct. 546, 69 L. Ed. 1032.

The question then, is: *First.* Did the officers have probable cause to arrest the appellant? The facts of this case indicate that a man of reasonable caution would have concluded that the appellant (i.e. the man who was seen running with two others from the burglarized store with a typewriter at 6:30 in the morning) was guilty of a felony. There is no indication that the eye witnesses were less than credible. The officers were aware that a felony was committed at the time of the sighting. The conduct and suspicious location of the appellant when he was seen by the several eye witnesses was clearly more than "suspicious." There is no reason presented anywhere in the record before this Court, or under the law of this country, that we might employ to hold that the trial court was in error when it ruled that probable cause was present. In fact, the decision appears entirely correct.

The question then (*Second.*) is: Did the officers have prob-

able cause to enter the premises? This, of course, is predicated on probable cause for the arrest. But, there must also have been probable cause to place the appellant in the house entered. From the testimony of the officers as to the report made by the eye witnesses, which indicated that the appellant was seen going behind the house with the typewriter, appeared again in front of the house sans typewriter, and then ran around behind it again, and from the testimony relating to the physical layout of the neighborhood, this Court should not, and cannot on this evidence, overrule the trial court decision in this matter. A reasonable man under the circumstances could have placed the appellant in the house (the fact that the judgment was correct lends support to this decision on the part of trained law officers as to the conduct of fleeing criminals). In light of the development of "reasonableness" as set out above, the question is really whether there was some sort of an emergency which would justify the entry into the house without a warrant for a search.

Judge Mote states that the circumstances of this case indicate that the officers were in "fresh pursuit" of the appellant. This, by necessity, entails two considerations:

> *First.* Was the time span here before the arrival of the police within the Constitutional limits under the doctrine of "fresh or hot pursuit" (depending on the preferred label)?
>
> *Second.* If so, does fresh pursuit measure up as a necessity for compliance with the Fourth Amendment's requirements of "reasonableness?"

It is my opinion that both of these questions are answered affirmatively in *Warden* v. *Hayden* (1967), 387 U. S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782. In that case the Supreme Court characterized the activity of the police as "fresh pursuit." The police arrived at the scene of a reported fleeing armed-robber about 5-to-10 minutes after the report was made by a taxi-cab driver. The felon was seen entering a house. The police initiated a search of the house, which encompassed a

room-to-room search and took approximately 5-to-10 minutes before the arrest was perfected. The entry of the police (apparently not by voluntary consent) was held by the Court to be within the limitations of the Fourth Amendment because of the emergency of the situation. Following that precedent (which was favorably cited in the recent stop-and-frisk case: *Terry* v. *Ohio, supra*), I must conclude that the officers acted on probable cause and with reasonableness in the instant case when they entered the house to perfect the arrest of the appellant. To hold otherwise would be to penalize rapid and efficient police response, and rob police enforcement of a valuable right. (These considerations are especially valid in light of the *Terry, supra,* holding.)

The final question presented by this case falls within the requirements of both the Fourth Amendment and Burns' Indiana Statutes Anno., (1956 Repl.), § 9-1009, which provides:

> "To make an arrest in criminal actions the officer may break open any outer or inner window of a dwelling house or any other building to execute a warrant, if, after notice of his authority and purpose, he be refused admittance.

This statute sets out the applicable standard for police entry to arrest when a warrant for the arrest has been procured. The dissent today asserts that this statute should be applied with equal vigor when a warrant is not acquired. This is indeed suggested in *Sabbath, supra*. However, the Supreme Court expressly reserved the question as to whether the requirement of "announcement" was as stringent in "exigent" circumstances. Therefore, to that issue, we must resolve on first impression.

It must be pointed out that the cases cited in the dissent today are federal interpretations of a similar statute passed by Congress. Because the statutes are similar, does not, however, sustain the proposition that the federal cases are con-

trolling precedent for this State. *Miller* v. *United States* (1958), 357 U. S. 301, 309, 78 S. Ct. 1190, 2 L. Ed. 2d 1332, was until *Ker* v. *California, supra,* the leading case in the area of "announcement before entry." *Miller* was, though, an interpretation of the Court under its rule-making power for the federal enforcement bodies, and does not stand as the minimal requirement of reasonableness under the Fourth Amendment. This is not to say that the Fourth's requirement is inapplicable to the methods of entry employed by a state's police officers. That question has yet to be expressly decided by the Supreme Court. Both *Miller, supra,* and *Ker, supra,* do indicate with some preciseness that some minimal standard does apply. Mr. Justice Clark in *Ker, supra,* recognized the distinction between the exclusionary rule when it is founded on the Constitution itself rather than the supervisory power of the Court. He pointed out that, although the "same fundamental criteria" had to govern both state and federal enforcement, the states were free to adopt "workable rules" governing methods of arrests and searches. These rules are subject to that Constitutional minimum, which includes the variances created by the exigencies that arise in any particular case. In *Ker, supra,* the arresting officers failed to give advance warning of entry out of fear that narcotics would be destroyed before they could perfect the arrests.

The dissent today urges that the trial court decision be reversed because the arresting officers failed to fully identify themselves and their mission before they forcefully entered the premises occupied by the appellant. While they recognize that there are certain exceptions to the "announcement" requirement, fresh pursuit is not among their listings. Mr. Justice Clark indicated, at page 27 of the opinion *Ker, supra,* that one of the reasons the Court found a probable-cause exception, thereby legitimizing the unannounced entry of the police, was the prior furtive conduct of the suspects, which could have reasonably led the police to believe that they were expected. From the conduct of the petitioners in that case,

it is difficult to rationalize the conduct of the appellant in the instant case as any less than furtive.

There are considerations which face this Court under this question which are more important, however, than merely discovering whether a case in point exists on which to rest this opinion. (Indiana has only scarcely discussed the problem.) Judge Learned Hand pointed out that when you are dealing with such admonitions as "unreasonable searches," there appears to be no escape in each situation from balancing the conflicting interests at stake with as detached a temper as we can achieve. Hand, *The Spirit of Liberty*, page 179 (Dillard, 3rd Ed. 1960). It is this balancing of interests between the right of the individual with the right of the state which we must pursue. It is my opinion that the danger of unjust and unwarranted invasions into the privacy of the individual under the circumstances of this case are slight. The danger that this Court, in writing new law, will effectively place another technical legal barrier to an already overburdened law enforcement system is great. And, the legal precedent and rationale are in favor of a resolution affirming the lower court's decision, and for that matter, the conduct of the officers involved.

As pointed out in the exhaustive study on the "announcement" law in this country by G. Robert Blakely, 112 U. Pa. L. R. 449 (1964), the highest frequency of violation by the police of the announcement requirements occurs in gambling and narcotics arrests. He points out that this is regretable because this is an area where surprise is an almost indispensable element of effective apprehension of the contraband. The growing involvement of organized crime in this area adds to the problem. I am not suggesting that this Court unleash the police from responsibilities they must bear under the State and Federal Constitutions. However, the Constitution calls only for "reasonableness" in the method of entry, and I think that this Court in great wisdom today does the same. This balancing of interests is reflected in the Supreme Court's

recent pronouncements on the stop-and-frisk laws. The Supreme Court of Massachusetts in *Howe* v. *Butterfield* (1849), 58 Mass. (4 Cush.) 302, called for no less when they ruled that notice of authority and purpose was not necessary when no one was evidently present or within hearing. The officers here, it is significant to note in light of that decision, knocked at the front and back doors and received absolutely no reply. This Court, in one of the few decisions rendered on this subject, ruled that there was no violation of Burns' § 9-1009, *supra*, where the door was, in the reasonable belief of the police, locked by the suspect to slow the police in their entry. See *Schreiber* v. *State* (1928), 201 Ind. 37, 164 N. E. 2d 258. This may have been reasonably within the contemplation of the police in this present case, especially in light of the fact that the police arrived on the scene so quickly, and the suspects, by feigning sleep, indicated that they knew very well who was at the door.

It should be pointed out that the Supreme Court has held in *Peters* v. *New York, supra,* that where an officer has probable cause for an arrest, he may entertain the presumption that the prisoner may be armed with a dangerous weapon. The Court through the long history of dispute over searches incident to a legal arrest has never doubted that an officer may search a felony suspect for weapons. Can this Court deny all logic and not allow the police to reasonably protect themselves while in fresh pursuit of fleeing felons to presume the felon armed and dangerous? If in good reason under such a circumstance we allow the police this practical consideration in light of the threat of the rising crime rate, then it becomes apparent that the officers in the instant case were availed of one of the "emergencies" listed by the dissent in the instant case.

It must be frankly stated that the case law outside this jurisdiction takes every position that is imaginable. Most states, however, make many exceptions to the statutes con-

trolling "announcement" that go far beyond the scope of the circumstances of this case. See Blakely, footnote 84, *supra*.

"Fresh pursuit" stands as one of the few exceptions to the warrant requirement of the Fourth Amendment. No compelling reason is presented in any case law surveyed, or in the dissenting opinion today, why this Court should apply a more stringent standard for the method of entry employed by police than we do to the right of the police officer to enter without a warrant. It is clear that the recent Supreme Court decisions require a higher showing of probable cause to justify an intrusion without a warrant. But, it is inherent in the nature of those exceptions that exceptions to the "announcement" statutes also be sanctioned. I think it significant to note that in the recent *Sabbath* decision, *supra,* the Court expressly reserved consideration as to whether exigent circumstances would excuse compliance with the Federal "announcement" rule. This variance in application is rendered even more reasonable from the fact that the legislature mentioned only arrests with warrants in Burns' § 9-1009, *supra*.

It is in light of these considerations that I concur with the majority in today's decision. I feel that this concurring opinion is in part guided by the philosophy expressed by Professor Freund:

"What gives concern . . . is . . . a tendency to make broad principles do service for specific problems that call for differentiation, a tendency toward overbroadness that is not an augury of enduring work and that misses the opportunity to use the litigation process for the refinement and adaptation of principle to meet the variety of concrete issues as they are presented in a lawsuit. . . . The law of the future is likely to be the law that earns its perdurance by solidity and strength of workmanship no less than by the appeal its results make to our ethical sense." Freund, *The Supreme Court of the United States,* page 188, (Meridian Ed. 1961).

ARTERBURN, J., concurs in this opinion also.

## Dissenting Opinion

HUNTER, J.—I must respectfully but vigorously dissent from the majority and concurring opinions for the reason that the majority of the Court fails to support with relevant authority its conclusion that the entry by police into the dwelling in question was constitutionally permissible.

The record, when viewed most favorably to the State, indicates that appellant and two others were charged with breaking into the Johnson Oil Company in Columbus, Indiana, early on the morning of June 19, 1966. Two witnesses who were parked in a Cummins Diesel Co. parking lot across the street testified that they saw three young men run from the Johnson Oil Company property that morning carrying a typewriter, saw them go around to the rear of a house next to the parking lot, and saw them emerge a short time later without the typewriter. Shortly thereafter, these witnesses saw the same three persons disappear behind the house again. There is nothing in the record to indicate that the police had any information placing the burglars inside the house in question. Within a few minutes, police were called to the scene and, upon learning that three persons had been acting suspiciously around the nearby house, decided to carry the investigation to the house. A knock on the front door by the officers produced no response. After stationing one officer at the front, they proceeded around to the rear of the house where a screen-enclosed porch blocked the way to the permanent weather door of the house. The testimony of the police officers who testified at trial establishes without question that the officers passed through a screen door onto the screen-enclosed porch without hesitation, and without knocking, and began knocking on the permanent back door of the house. At about this time, before entry into the house proper, and before any arrest was made, one of the officers on the porch saw a typewriter sitting in a partially open closet on the porch. Thereafter, the officers entered the house and arrested appellant

and his co-defendants, who were feigning sleep. At no time before the entry did the officers identify themselves or state the purpose for their presence. The house was the residence of the appellant's parents.

At the time the police entered the house, they had neither a search warrant nor a warrant for arrest.

Prior to trial, appellant filed a motion to suppress the typewriter from evidence, which motion was overruled by the trial court. The typewriter was subsequently admitted into evidence at trial over appellant's objection. Upon this appeal, appellant's principal contention is that the typewriter was procured by the police as the result of an unlawful search and seizure, and that the trial court committed prejudicial error in overruling his motion to suppress the typewriter, in admitting it into evidence, and in failing to grant appellant's motion for new trial alleging error thereon.

The State of Indiana, in an attempt to rebut this argument, contends that the typewriter was not procured by a search because the term "search" implies prying into hidden places for that which is concealed, and that in the present case the typewriter was not in a hidden place but was in plain view of the officers as they entered the house. With this argument, however, the State wholly fails to grapple with the central question involved in this case. For at the time the typewriter was discovered, *the police had not been given permission to enter the screen-enclosed porch, had no warrant of any kind, and no arrest had been made, nor was one in progress. And even if the entry onto the porch did not constitute a search, it seems that the same privacy was invaded as if the entry and subsequent conduct by police were given the label of a search.*

Therefore, the essential question to be determined in this case is whether the police officers, *without a warrant for either search or arrest were justified in entering upon the screen-enclosed porch* where the typewriter was found, and

if they were not, what effect should this have upon admissibil-. ity of the typewriter into evidence.

The majority opinion fails to recognize that it is the illegality of the entry in this case that makes the search invalid, not the fact that the search occurred before the arrest.

For purposes of orderly discussion, the problem will be dealt with in two parts: first, where entry by law officers is for the purpose of conducting a search, and second, where entry is made for the purpose of making an arrest.

I

Ordinarily, either a warrant or consent is required to allow officers to enter upon and search a private dwelling and its curtilage. *Camara* v. *Municipal Ct. of San Francisco* (1967), 87 S. Ct. 1727. A search without a warrant and without consent can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the recognized exceptions. *Stoner* v. *California* (1964), 376 U. S. 483. Generally, these exceptions are:

(a) Search of immediate surroundings incident to a lawful arrest. *Carroll* v. *United States* (1925), 367 U. S. 132.

(b) Entry under emergency circumstances, such as to prevent disappearance of a movable vehicle, to present commission of a violent crime, to prevent imminent destruction removal or concealment of the property to be seized. *United States* v. *Jeffers* (1951), 342 U. S. 48; *McDonald* v. *United States* (1948), 335 U. S. 451; *United States* v. *Barone*, 330 F. 2d 543, (2d Cir. 1964) ; *Wilson* v. *State* (1966), 247 Ind. 454, 217 N. E. 2d 147.

It appears clear from a survey of the cases that when evidence concerning defendant's activities is observed by officers upon private property, in the course of conduct amounting to an interference with defendant's right to privacy, such evidence is inadmissible absent a warrant, a proper consent, or an emergency situation demanding immediate entry. *McDonald* v. *United States, supra; People* v. *Terrell* (1967), 277

N. Y. S. 2d 926; *Polk* v. *United States,* 291 F. 2d 230 (9th Cir. 1961); *Brock* v. *United States,* 223 F. 2d 681 (5th Cir. 1955).

It has been consistently held for many years that outbuildings on the grounds surrounding a dwelling are within the "curtilage" of the dwelling and are protected from intrusion by the 4th amendment to the Constitution of the United States and by the Constitution of Indiana, Art. I, § 11. *Walker* v. *United States,* 225 F. 2d 447 (5th Cir. 1955) (a barn, 70 to 80 yards from the dwelling); *Taylor* v. *United States* (1931), 286 U. S. 1 (a metal garage adjacent to the dwelling house); *Walker* v. *United States,* 125 F. 2d 395 (5th Cir. 1942) (a shed consisting of a chicken house and garage); *Idol* v. *State* (1954), 233 Ind. 307, 119 N. E. 2d 428 (garage of fraternity house in Indianapolis); *People* v. *Terrell* (1967), *supra,* (a fire escape); *Rosencranz* v. *United States,* 356 F. 2d 310 (1st Cir. 1965) (a barn) See also: *U. S.* v. *Mullin,* 329 F. 2d 296 (4th Cir. 1964) (a smokehouse).

From this survey of cases, it seems unavoidable that a screen-enclosed porch connected to the dwelling itself cannot be entered for purposes of conducting a *search* without a search warrant *unless consent is given* or an *emergency exists.* And if such entry is made, the occupant's right to privacy is invaded and evidence resulting from such invasion is inadmissible in a court of law. This nation's high regard for the right of every individual to privacy is undeniable. In *District of Columbia* v. *Little,* 178 F. 2d 13 (CCA., D. C. 1949), in which the argument was put forth that the protection against unreasonable search and seizure applied only to protection against unreasonable search and seizure applied only to protect the criminal against self-incrimination, the court, in addition to eloquently explaining the basis of the right of privacy, clearly states that it is the right of every man:

> "The basic premise of the prohibition against searches was not protection against self-incrimination; it was the common-law right of a man to privacy in his home, a right

which is one of the indispensable ultimate essentials of our concept of civilization. It was firmly established in the common law as one of the bright features of the Anglo-Saxon contributions to human progress. It was not related to crime or to suspicion of crime. It belonged to all men, not merely to criminals, real or suspected. So much is clear from any examination of history, whether slight or exhaustive . . .

The Fourth Amendment did not confer a right upon the people. It was a precautionary statement of a lack of federal governmental power, coupled with a rigidly restricted permission to invade the existing right. The right guaranteed was a right already belonging to the people. The reason for the search warrant clause was that public interest required that personal privacy be invadable for the detection of crime, and the Amendment provided the sole and only permissible process by which the right of privacy could be invaded. To view the Amendment as a limitation upon an otherwise unlimited right to search is to invert completely the true posture of rights and the limitations thereon." 178 F. 2d at 16.

There is no indication in the record of this case that the officers were faced with any emergency which would justify their entry to make a search without first obtaining a warrant.

On the other hand, the officers had witnesses giving them probable cause to arrest the defendants and could easily have acquired warrants for that purpose or for the purpose of conducting a search of the house in question.

As noted above, we do not disagree with the majority's assertion that a search made incidental to a lawful arrest is valid, even though made without a warrant. But the *entry* made by law enforcement officers into the dwelling in each of the state court cases cited by the majority opinion to support this proposition was either a valid, proper entry under the circumstances, or was not dealt with by the court.

In *People* v. *Vice* (1956), 147 Cal. App. 2d 269, 305 P. 2d 270, the question of the validity of the conduct of the police in entering an apartment without either a search or arrest warrant was not discussed. However, it must be realized that

in that case the police had direct information that the suspect was present in the apartment and also that the contraband involved was heroin, which is easily destroyed or disposed of. Therefore, the police entry in that case was justified as an emergency measure.

In *People* v. *Hughes* (1960), 183 Cal. App. 2d 107, 6 Cal. Rptr. 643, the police were admitted to the home of appellant by appellant's wife. It was on the basis of *consent* that such entry to search was valid.

In *Knight* v. *State* (1926), 171 Ark. 882, 286 S. W. 1013, one officer entered the defendant's premises and searched the lower level while another officer went in search of appellant. After appellant was brought back to the house, an illegal still was discovered on the second level of the dwelling. Nothing was found which the state attempted to use as evidence until the appellant was present. However, the court fails to deal with the issue of the lawfulness of sheriff's entry into and presence in the house.

In *Gray* v. *State* (1960), 207 Tenn. 39, 336 S. W. 2d 22, appellant was charged with possession of untaxed intoxicating liquors. He raised the question of illegal search and seizure due to entry by State Police into a dwelling house without any warrant. In that case the officers in question observed persons carrying and drinking from jugs of liquid, observed persons around the house flee at the sight of law enforcement officers, and saw many people coming and going at the house. In view of the disposable nature of alcoholic beverages and the warning the occupants of the house had, as well as the apparently public use being made of the house, both the emergency exception and the fact that no one's privacy was violated result in the conclusion that no unlawful entry occurred in that case.

On the basis of the foregoing, the screen-enclosed porch involved qualifies as a constitutionally protected area, and it should be held that the officers in this case were not justi-

fied intering to conduct a search since there was no emergency justifying their failure to obtain a warrant.

## II

The Indiana General Assembly has set a very clear policy relative to the authority of officers of the law to enter a dwelling house without permission for the purpose of carrying out a warrant for arrest. Ind. Anno. Stat. § 9-1009 (1956 Repl.) provides:

> "To make an arrest in criminal actions the officer may break open any outer or inner door or window of a dwelling house or any other building or inclosure to execute the warrant, *if, after notice of his authority and purpose, he be refused admittance.*" (Emphasis added.)

The Supreme Court of the United States, in cases involving its supervisory power over lower federal courts, recently interpreted a similar federal statute in the identical manner, as follows in *Sabbath* v. *United States* (1968), 320 U. S. 219, 88 S. Ct. 1755:

> "The statute here involved, 18 USC § 3109, deals with the entry of federal officers into a dwelling in terms only in regard to the execution of a search warrant. This Court has held, however, that the validity of such an entry of a federal officer to effect an arrest without a warrant 'must be tested by criteria identical to those embodied in' that statute. *Miller* v. *United States* (1958), 357 U. S. 301; *Wong-Sun* v. *United States* (1963), 371 U. S. 471."

We are in full agreement with the concurring opinion's statement that the *Sabbath* and *Miller* cases, cited, *supra,* are not controlling precedent for this State. On the other hand, the decisions of the highest court in this nation, when so clearly well-reasoned and analogous, should not be so lightly dismissed. They can provide for us wise and helpful guidance in solving the very difficult question which confronts this Court.

In *Miller* v. *United States, supra,* the history of statutes such as Ind. Anno. Stat. § 9-1009, *supra,* is examined in depth and at one point, our statute is cited as requiring the same standard of conduct as is required of federal officers. Mr. Justice Brennan, speaking for the Court, states in the majority opinion:

"From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Year-book of Edward IV (1461-1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle:

"The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!"

But the common law recognized some authority in law officers to break the door of a dwelling to arrest for felony. The common-law authorities differ, however, as to the circumstances in which this was the case. Hawkins says: "where one lies under a probable Suspicion only, and is not indicted, it seems the better Opinion at this Day, That no one can justify the Breaking open Doors in Order to apprehend him." 2 Hawkins, Pleas of the Crown, c. 14, § 7 (1762) ; see also Foster, Crown Law, 321 (2d ed. 1776). Coke appears to have been of the same view, and to have thought that the breaking of a house was limited to cases in which a writ, now our warrant, had issued. Co. 4th Inst. 177. On the other hand, Hale says that "A man, that arrests upon suspicion of felony, may break open doors, if the party refuse upon demand to open them. . . ." 1 Hale, Pleas of the Crown, 583 (1736).

Whatever the circumstances under which breaking a door to arrest for felony might be lawful, however, the

breaking was unlawful where the officer failed first to state his authority and purpose for demanding admission. The requirement was pronounced in 1603 in Semayne's Case, 5 Coke 91, 11 ERC 629, 77 Eng. Reprint 194: "In all cases where the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K(ing)'s process, if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors. . . ." (Emphasis supplied.)

The requirement stated in Semayne's Case still obtains. It is reflected in 18 USC § 3109, in the statutes of a large number of States, (citing, *inter alia,* Ind. Anno. Stat. § 9-1009, *supra)* and in the American Law Institute's proposed Code of Criminal Procedure, § 28." 357 U. S. 306-09.

If more latitude were allowed when no warrant is obtained, than is allowed when one *is* obtained, the wise approach for law enforcement agencies would be never to seek issuance of an arrest warrant. With this in view the rule has been developed that although it is generally recognized that an officer may break doors to enter a private dwelling without a warrant in order to make an arrest upon probable cause; before such doors are broken without a warrant, there must be a necessity for doing so, and the *officer must give notice of his authority and purpose to make an arrest, and demand and be refused admittance* unless such matters are already understood, or the peril would be increased. *Accarino* v. *United States,* 179 F. 2d 456 (D. C. Cir., 1949) ; *Miller* v. *United States, supra;* Fisher, *Laws of Arrest* § § 120-27.

There are other circumstances which have been held to justify an officer's failure to announce his authority and purpose, and his failure to demand entry before breaking open the doors of a dwelling; for instance, where there is grave danger to the officers, when a delay might frustrate the opportunity to arrest, or when advance notice is likely to result in destruction of important evidence. *Miller* v. *United States, supra; People* v. *Maddox* (1956), 46 Cal. 2d 301, 294 P. 2d 6, cert. den. 352 U. S. 858, 77 S. Ct. 81; Fisher, *Laws of*

*Arrest, supra.* In our judgment, however, no such exception or emergency is present in this case unless this Court is prepared to adopt an exception for "almost-fresh-pursuit."

The concurring opinion refers to the facts in this case as presenting a situation of "fresh pursuit," and concludes therefrom that the officers were justified in entering the house in question here without consent and without a warrant. In support of this proposition, the recent case of *Warden* v. *Hayden* (1967), 387 U. S. 294 is relied upon. However, the facts of that case clearly demonstrate what constitutes "fresh pursuit," and likewise demonstrate that there is no basis for invoking the "fresh pursuit" exception in the present case. In *Hayden,* two cab drivers *followed* a man fleeing the scene of an armed robbery, and saw him enter a private home. One of the drivers then radioed this information to his dispatcher, who relayed it to the police. Within minutes, the police arrived, *knocked on the door and, after asking to search the house,* were admitted without objection by the defendant's wife.

In approving this entry by police, the Supreme Court of the United States held that under the circumstances, the exigencies of the situation made the course taken by police imperative. It will be noted that the "exigencies of the situation" were two in number. First, the police knew they were dealing with an *armed* suspect and; Second, the police knew with certainty that the suspect was in the house because he had been followed there, had been seen entering there by way of the front door and had not emerged. Furthermore, the Supreme Court notes that the state post-conviction court had found that the defendant's wife *"gave the policemen permission to enter the home."*

It is clear from the *Hayden* case that the court based its approval of the entry upon the fact that the suspect was known to be armed and had actually been followed to the residence, had been seen entering, and had not left. Im-

mediately after approving the entry the Court sets out the basis for its decision:

"The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to affect an escape." 387 U. S. at 298-99.

"Fresh pursuit," therefore, is clearly limited in *Hayden* to situations in which the suspect is *seen* entering the building, and is accompanied in *Hayden* by the fact that the suspect was *known* to be armed and dangerous. Indeed, the emergency stressed by the Court in its opinion is not the "fresh pursuit" concept, which, in itself, does not necessarily present an emergency, but that fact that the officers and others were pursuing an armed man who "gravely" endangered their lives or the lives of others.

The case presently before the court fails to measure up to the facts in the *Hayden* case in either respect. First, there was no "fresh pursuit" here since the police did not know, nor were they told, that the suspects were seen entering the home in question here. Furthermore, they had no indication that the suspects were armed, and they did not demonstrate any fear of such a possibility in approaching and entering the house. *Warden* v. *Hayden, supra,* is, therefore, totally inapplicable to the case presently before us.

The concurring opinion cites the Indiana case of *Schreiber* v. *State* (1928), 201 Ind. 37, 164 N. E. 258 for the proposition that law enforcement officers do not violate § 9-1009, *supra,*

by breaking down the outer door where they reasonably believe that the door has been locked by the suspect to slow the police in their entry. In that case, however, the police *first acquired a search warrant*. Then, upon arriving at the place to be searched, they *knocked and announced themselves before entering*. Furthermore, in the case at bar, the door entered was not locked, and the police had no reason to believe it was locked. The *Schreiber* case, therefore, likewise wholly fails to support the position taken by the concurring opinion.

In *Stearsman et al.* v. *State* (1957), 237 Ind. 149, 143 N. E. 2d 81, which is cited in the majority opinion to justify the police entry in this case, the question of the legality of the entry into the house was not dealt with. The case seemed to turn only on whether or not the arrests made there were made with probable cause. Since there was probable cause, the court said, the search that took place following the arrest was proper. There are three reasons that the *Stearsman* case cannot be cited to support as legal an unconsented to and unannounced entry by police under the guise of "probable cause" only:

(1) There is evidence in the record of the *Stearsman* case indicating the police were admitted to the home voluntarily after asking permission.

(2) The record in *Stearsman* also indicates the police announced themselves and their purpose before entering and

(3) the entry made by the police in the *Stearsman* case was based partly upon the fact that the officer in charge had heard some mechanical sawing going on in the house which could have led to the belief that evidence was being destroyed or altered, since the stolen property included a locked metal box.

In *Henderson* v. *State* (1955), 235 Ind. 132, 131 N. E. 2d 326, also cited by the majority, the police entered appellant's apartment without a warrant of any kind and without consent after receiving a report that gun shots had been fired there. It should be elementary that it is the very nature of a

firearm to cause injury or destruction when it is used by one person against another. And when used successfully, an immediate and serious emergency arises. Under the rulings hereinbefore cited relative to emergency entry to search, it is clear that the entry by police in the *Henderson* case is to be justified upon emergency grounds, and no other. The case certainly gives no support to the proposition that the police may enter any dwelling without a warrant if they have reasonable grounds to believe a felony has been committed and the felon is in that dwelling. In *Henderson,* and in every case of entry without warrant and without consent, more is required, even though the loose language of some of our former opinions would not seem to so state the rule.

As to the force required to qualify an entry as a "breaking," it is well-recognized that even though an entry is not forcibly accomplished, it may amount to the legal equivalent of a "breaking" where a closed door is opened and passed through without permission. *Ker* v. *California* (1963), 374 U. S. 23, 38; *Munoz* v. *United States,* 325 F. 2d 23 (9th Cir., 1963), Fisher, *Laws of Arrest,* § 120. Whether or not a door was locked should be of no consequence in determining whether a "breaking" has occurred. The right to privacy is governed by more than the fortuitous circumstance of an unlocked door. An entry, to be peaceful, *must be permissive,* and not merely one which does not result in a breaking of parts of the house. *Sabbath* v. *United States, supra; Keiningham* v. *United States,* 287 F. 2d 126, 130 (D. C. Cir., 1960); cited with approval, *Ker* v. *California, supra.*

The limitations placed upon an officer's right to break doors to accomplish an arrest without a warrant, and the reasons for those limitations, were well summarized in *Accarino* v. *United States, supra:*

> "A court is reluctant to suppress evidence which, if obtained in lawful fashion, would have been of compelling importance to a prosecution for felony. But there is no other course by which the court can insist upon compliance

by police officers with. the requirements of law in respect to arrests and searches . . . The applicable rule of law is not difficult to understand. It rests, to be sure, upon the exercise of reasonably sound judgment in appraising the necessities of the moment; but, as we have just said, so does almost every other duty of the police. Unless the necessities of the moment require that the officer break down a door, he cannot do so without a warrant; and if in reasonable comtemplation there is opportunity to get a warrant, or the arrest could as well be made by some other method, the outer door to a dwelling cannot be broken to make an arrest without a warrant. The right to break open a door to make an arrest requires something more than the mere right to arrest. If nothing additional were required, a man's right of privacy in his home would be no more than his rights on the street; and the right to arrest without a warrant would be precisely the same as the right to arrest with a warrant. The law is otherwise." 179 F. 2d at 464.

Another case that bears directly upon the issue of entry without a warrant is *Work* v. *United States,* 243 F. 2d 660, (D. C. Cir. 1957). In that case, two federal law enforcement officers went to appellant's residence after allegedly receiving information that a young girl known to them to be a prostitute and narcotics addict was using narcotics there. They obtained no warrant for arrest or search, and after knocking on the door and receiving no answer, they opened the door and stepped in a few steps. At that moment, appellant walked by them, went out the door and appeared to deposit something in a trash can, but the officers saw nothing in her hand. Shortly thereafter, one of the officers found a phial of pills in the trash can. At trial appellant moved to suppress the phial and its contents, but the trial court overruled her motion. On appeal, the Circuit Court of Appeals said:

"However well intentioned, the entry into the home without a warrant of any kind was not under 'exceptional circumstances' dispensing with the necessity for a warrant. (Citing *Johnson* v. *United States,* 333 U. S. 10.) Accord-

ingly, it was the beginning of an unreasonable search." 243 F. 2d at 661.

Later in the opinion the Court of Appeals stated:

"We need not decide whether the officers would have obtained the phial independently of their illegal entry since the circumstances show that the seizure was a direct consequence of the search which began with the entry which did occur. An imaginary case postulated upon what might have happened if there had been no illegal entry is not before us." 243 F. 2d at 662.

In the case presently before us, there is no indication that "the necessities of the moment" were so urgent as to excuse the police from their duty to acquire a warrant before attempting to enter the back porch. It is undeniable, on the other hand, that the search and seizure which occurred grew directly out of the unlawful police entry. *Work* v. *United States, supra.* There were as least five officers present at the scene of the arrest, and at least one officer was covering the front door at the time others were entering through the rear. The possibility of escape was minimal. Nor would it appear that the officers present believed there was any immediate threat of danger or other emergency, inasmuch as they knocked on the front door first; apparently without fear of impending violence. Indeed, they had no reason to believe the suspects were armed, even if they were in the house.

Furthermore, assuming without conceding that "the necessities of the moment" demanded immediate entry and arrest without a warrant, no circumstance appears which would excuse the officers from first announcing their authority and purpose and demanding admittance, as are required by our statute where a door is broken open *with* a warrant. Ind. Anno. Stat. § 9-1009 (1956 Repl.), *supra.*

The net effect of today's majority and concurring opinions is to hold that whenever the police have probable cause to believe that a felon is present in a private residence, whether or not any emergency exists, and even though they are not in

fresh pursuit, they may enter such private residence without acquiring a warrant and in violation of the minimal statutory requirements set down by our state legislature for execution of a warrant, once one is acquired.

The main opinion adopts the rule today that the police shall always have a right to enter and arrest without a warrant by decreeing *almost fresh pursuit* as the basis for probable cause to enter, and would therefore justify the invalid entry *sans* "emergency situations," or the "exigencies of the moment."

The concuring opinion would also erroneously withhold the "right of privacy" and refuse to even grudgingly extend that right on the same erroneous theory of *almost fresh pursuit* by characterizing the facts in the instant case as *"fresh pursuit."*

Both the main and concurring opinions seem to pose the inevitable questions: (1) under what circumstances is a peace officer required to obtain a warrant for arrest or search? and (2) And under what circumstances is a peace officer required to comply with the terms of Ind. Anno. Stat. § 9-1009, *supra?*

And both opinions answer both questions with one word:— *Never.* The next question this Court should answer is: Wherefrom comes its authority to repeal the Fourth Amendment to the Constitution of the United States?

It is contended by appellee State of Indiana that appellant had no standing to claim his right to be free from unreasonable searches and seizures.

Article 1, § 11 of the Constitution of Indiana is practically a reiteration of the Fourth Amendment to the Constitution of the United States. To this date, however, the courts of this State have limited the application of the Indiana provision to much more narrow confines. The Indiana view has been that even if law enforcement officers conduct a search in violation of the privilege against unreasonable searches and seizures, a defendant cannot raise any question as to the

legality of such search unless such defendant controls, owns, possesses or claims some interest in the property searched. *Wilson* v. *State* (1966), 247 Ind. 454, 217 N. E. 2d 147; *Minton* v. *State* (1966), 247 Ind. 307, 214 N. E. 2d 380; *May* v. *State* (1953), 232 Ind. 523, 112 N. E. 2d 439; *Tyler* v. *State* (1931), 202 Ind. 559, 177 N. E. 197. The view of these cases, in essence, is that the right to object to an unreasonable search or seizure is personal to the one who owns, controls or claims an interest in the property.

It is difficult to understand why this Court has persisted so long in its narrow interpretation of the scope of the right of privacy and the right to be free from unreasonable searches and seizures. As long ago as 1951, in the case of *United States* v. *Jeffers*, 342 U. S. 48 the Supreme Court of the United States squarely met the question of whether the Fourth Amendment to the Constitution of the United States applied to persons other than those who own, possess, control or claim some interest in the premises searched.

In that case, defendant had stored contraband narcotics in a hotel room without the knowledge of the occupants, his aunts, who had permitted him to use the room. Without a search or arrest warrant, law enforcement officers gained access to the room in the absence of the defendant and the occupants, and after searching it, seized the narcotics. The seized narcotics were introduced at defendant's trial after his pre-trial motion to suppress the evidence had been denied. In reversing the conviction, Mr. Justice Clark speaking for the court said:

> "To hold that this search and seizure were lawful as to the respondent would permit a quibbling distinction to overturn a principle which was designed to protect a fundamental right. The respondent unquestionably had standing to object to the seizure made without warrant or arrest unless the contraband nature of the narcotics seized precluded his assertion, for purposes of the exclusionary rule, of a property interest therein." 342 U. S. at 52.

The Court then rejected the view that the fact that the goods were contraband prevented application of the exclusionary rule. In 1960, the Supreme Court of the United States reaffirmed the language of *United States* v. *Jeffers, supra,* when it stated in *Jones* v. *United States* (1960), 362 U. S. 257:

> "We are persuaded . . . that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical . . . *No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him.*" 362 U. S. at 266-67. (Our emphasis.)

The persuasiveness of the position of the Supreme Court of the United States on this point of law is unavoidable. Moreover, in view of these and other decisions of the highest court in our nation, this Court is no longer free to apply its narrow view that the right against unreasonable searches and seizures is personal to he who owns, controls, or claims some interest in the premises. In 1949 the Supreme Court stated expressly that the Fourth Amendment to the Constitution of the United States is applicable to the states as a matter of due process of law. Const. of U. S., Amend. 14. In *Wolf* v. *Colorado* (1949), 388 U. S. 25, the Court, speaking through Mr. Justice Frankfurter, stated:

> "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause." 388 U. S. at 27-28.

Then in *Mapp* v. *Ohio* (1961), 367 U. S. 643 the same Supreme Court took the final step and held that evidence seized in

violation of the Fourth Amendment to the Constitution of the United States is inadmissible in State criminal prosecutions.

Therefore it is clear that even if it were concluded that Article I, § 11 of the Constitution of Indiana protects only one who owns, controls or claims an interest in the premises searched, a point which we do not concede, the Fourth Amendment to the Constitution of the United States requires that the appellant in the case at bar be recognized as having standing to claim the privilege.

Appellant is the emancipated son of the owner of the house where he was arrested and where the typewriter was found. The testimony of appellant's father demonstrates that appellant frequently used the house and was freely permitted to do so. Therefore, appellant falls clearly into the category of persons who may claim the protection of the Fourth Amendment. *United States* v. *Jeffers, supra; Jones* v. *United States, supra.*

Under the authorities above referred to, this Court should also hold that the right to be free from unreasonable searches and seizures is equally broad under Article I, § 11 of the Constitution of Indiana and that appellant therefore falls within the class of persons entitled to claim the right under Indiana's own Constitution. Such constitutional privileges and protections should not be reluctantly extended nor arbitrarily withheld by the courts of this State.

The right to privacy is a far greater matter than a mere academic subtlety. The right to be free from arbitrary intrusions by governmental officials into dwelling houses is deeply rooted in this nation's system of government by law, and is to be regarded as one of our country's most precious achievements. It is based upon a belief built into our state and federal constitutions that there is something sacred and inviolable in the individual and in the private residence.

Daily life in our complex society is marked by constant

and harassing intrusions from both the governmental and non-governmental sectors, which gravely decrease the ability of any man to protect himself and his family from unjustified investigations into their most personal affairs. To eliminate the requirement that law enforcement officers obtain judicial sanction before entering a residence without the consent of the occupants would constitute a significant step backward in the American search for a system of "ordered liberty" which emphasizes the importance and integrity of individual rights.

On the basis of the foregoing discussion of the law regarding the propriety of entry into a dwelling house by law enforcement officers, without consent, without a warrant for search or arrest, without announcing their authority and purpose and demanding entry, and absent a substantial emergency, it is clear that appellant's motion to suppress the typewriter from the evidence should have been sustained. Entry by police into a screen-enclosed porch by opening a closed door thereto without either consent or sufficient legal process and in the absence of the showing of an emergency necessitating such an entry is an invasion of the constitutional right to privacy and cannot be condoned. Therefore, when the discovery of evidence, sought to be used against the appellant, is inextricably bound up with such an *illegal entry* and *unlawful arrest*, such evidence should be excluded from consideration in order that the *courts* might *protect the higher right of every citizen of this State to some semblance of personal privacy.*

In summation, since, in this case, the arrest of the appellant was invalid by reason of the unlawful entry into the house by the officers, we believe the seizure of the typewriter in question here was violative of Art. I, § 11 of the Constitution of Indiana and the Fourth Amendment to the Constitution of the United States.

Constitutional rights should not be grudgingly extended nor arbitrarily withheld in the false name of stricter law

enforcement. *Cook* v. *State* (1951), 231 Ind. 695, 97 N. E. 2d 625. The law enforcement agencies of this State are fully capable of performing their functions within the bounds of our State and Federal constitutions. And when they fail to do so, it is not the function of this Court to manufacture fictional excuses for them. This case should be reversed.

JACKSON, J., concurs.

### PETITION FOR REHEARING

LEWIS, C. J. — This cause is before us on a Petition for Rehearing, which Petition, for the following reasons, is denied:

Appellant first urges as a basis for rehearing this Court's failure to pass upon an alleged error, to-wit: that the trial court erred in overruling Appellant's Motion in Arrest of Judgment. This Motion, filed after the jury's verdict, states that the affidavit, charging Appellant with a crime, read:

> "To unlawfully and feloniously obtain unauthorized control over property of the said Richard L. Johnson and permanently deprive him of the use and benefit of any property then and there obtained."

Also, that this affidavit varied fundamentally and fatally with the statute (§ 10-3030 Burns' Ind. Stat. Anno.) which reads:

> "A person commits theft when he (1) knowingly: (a) obtains or exerts unauthorized control over property of the owner and intends to deprive the owner permanently of the use or benefit of the property."

The Appellant urged in his Motion and in his Brief that the judgment be arrested because of the omission of language in the affidavit requiring the element of *mens rea*.

It appears first that the Motion in Arrest of Judgment was properly overruled. The law in Indiana, as stated in *Britt* v. *State* (1962), 242 Ind. 548, 554, 180 N. E. 2d 235, is:

"Although a defective affidavit may be held insufficient on a motion to quash, such defect on a motion in arrest of judgment would be cured by verdict."

See also: *State* v. *Kimener* (1956), 235 Ind. 191, 132 N. E. 2d 264; *Pope* v. *State* (1944), 227 Ind. 197, 84 N. E. 2d 887; *Romary* v. *State* (1945), 223 Ind. 667, 64 N. E. 2d 22. It is further noted, as pointed out in Appellee's original brief, that the trial court used the word "knowingly" in its Instruction #5, which defined the crime of theft. Based on the above, the error alleged by Appellant in his Brief and in his Petition for Rehearing is without merit and if a rehearing were to be granted on this point, the judgment below would again be affirmed.

This Court has decided that where an original opinion has correctly affirmed a judgment, but has failed to decide a question presented, a petition for rehearing should be denied if such rehearing would result again in affirmace. It has also been decided that the undecided question is properly dealt with in the opinion denying the Petition for Rehearing. See: *Anderson* v. *Anderson* (1895), 141 Ind. 567, 40 N. E. 131.

Appellant next submits that this Court erred in its opinion by sustaining the trial court's denial of Appellant's Motion to Suppress Evidence. It would be an understatement to note that this question was discussed at length in three separate opinions. It is not the proper function of a petition for rehearing to ask this Court to generally re-examine and reconsider matters decided adversely to the petitioner, rather such a motion should point out to the Court mistakes of law or fact made in arriving at its decision.

It is submitted that Appellant raises no new questions, that each of the three remaining paragraphs of his Petition was discussed in depth in the Court's total opinion and that the Petition for Rehearing therefore is denied.

Arterburn, J., concurs.

Jackson and Hunter, JJ., dissent.

DeBruler, J., not participating.

NOTE.—Reported in 238 N. E. 2d 888. Rehearing reported in 242 N. E. 2d 357.